IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARSON HILL GOLD MINING CORPORATION, a Nevada corporation,<br><br>Plaintiffs,<br><br>v.<br><br>SUTTON ENTERPRISES, a California general partnership,<br><br>Defendants. | CV F 06-1193 AWI SMS<br><br>ORDER GRANTING PLAINTIFF'S REQUEST FOR TEMPORARY RESTRAINING ORDER AND RELATED ORDERS<br><br>[Document # 7] |

## INTRODUCTION

This is an action for injunctive and declaratory relief by plaintiff Carson Hill Gold Mining Corporation ("Plaintiff" or "Carson Hill") which has noticed for an application for temporary restraining order to prevent defendant Sutton Enterprises ("Defendant" or "Sutton") from interfering in efforts by Plaintiff to implement an amended Corrective Action Plan ("CAP"). The CAP developed at the direction of the California Regional Water Quality Control Board ("Water Board") to prevent significant contamination of regional water supplies with toxic mining wastes. On September 8, 2006, Plaintiff filed a document titled "Ex Parte Application for Temporary Restraining Order ("TRO") and Order to Show Cause RE: Preliminary Injunction" (the "Application"). The Application was served on Defendant on September 8, 2006. Defendant filed an opposition to the Application on September 14, 2006, and a reply was filed on

September 15, 2006.  For the reasons that follow, the court should grant Plaintiff's request for TRO.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual background is based on Plaintiff's factual allegations contained in the complaint and by facts alleged in the Application, which are generally supported by exhibits submitted by Plaintiff.  Facts that are disputed by Defendant are so noted.

Carson Hill is a Nevada corporation that owned and operated the Carson Hill Mine, a gold mine located in Calaveras County near Angels Camp.  The mine was continuously operated as a gold mine from the 1850's to 1989.  Plaintiff closed the mine in the 1990s in accordance with its closure plan.  On or about December 20, 1996, the parties executed a contract of sale of the Carson Hill Mine to Defendant, a California general partnership, for the sum of $300,000.  The Purchase and Sale Agreement ("Sale Agreement") between the parties  transferred all of Plaintiff's interest in the mine to Defendant, except that Plaintiff retained substantial rights to continue monitoring for purposes of regulatory compliance, and rights to undertake "such actions as necessary for the purpose of complying with and satisfying the Regulatory Requirements, and to determine whether [Defendant's] operations or activities are in any way impairing the condition of the Subject Property of adversely affecting Seller's ability to meet, satisfy or otherwise comply with the Regulatory Requirements."  The sales agreement also prohibited Defendant from assigning any of the rights or obligations under the agreement without the written consent of Plaintiff.

Located on property encompassing the Carson Hill Mine are areas called Waste Management Units ("WMUs"), which apparently consist primarily of mine tailings and other mine waste.  Contained in the WMUs is a very large volume of rock that is crushed during mining operations to a uniform size of one and one-half inches.  Sutton is in the business of mining the WMUs for rock aggregate, which it sells.

On May 3, 2005, Water Board notified Defendant that discharges from the WMUs that

occurred during runoff from winter rains exceeded established levels for certain contaminants. The notification by the water board cited results of water quality monitoring in the WMUs that found "elevated concentrations of TDS total cyanide, nitrate, sulfate, iron, manganese, nickle, sodium and selenium from percolation of rain water through the vegetated soil cover and waste rock." Exh. A to Pierce Dec., Doc. 10. These contaminants, plus cadmium, were also found from groundwater monitoring in areas impacted by the WMUs. The Water Board observed that, in view of the level of contaminates in the leachate from the WMUs, relevant statute mandated that the WMUs be "capped according to the Group B mining waste closure requirements described in Title 27 CCR, Section 22510." Water Board's notice closed by requiring "a [Report of Waste Discharge], in the form of a CAP, [to be] submitted by 25 July 2005." Id. Remediation was to be completed by October of 2006.

At the time of the notification, Carson Hill's parent company was sold to BHP Billiton, and Carson Hill requested and received an extension of time to submit the CAP until October 25, 2005, at which time they filed their proposed draft CAP.

The Application alleges that Carson Hill requested input from, and pledged cooperation with, Sutton to develop the CAP. The facts imply, but do not state, that suggestions for the accomplishment of the Water Board directive to formulate a CAP were not forthcoming from Defendant. At oral argument, Defendant represented that it had been in contact with Plaintiff regarding the development of a CAP, but had not been included in certain meetings that had transpired between Plaintiff and Water Board.

Defendant's opposition to the Application indicates that Defendant has had an ongoing dialogue with Plaintiff centering not so much on Plaintiff's strategy to correct the environmental violation, but on the extent to which Plaintiff is permitted to carry out remedial activities within the property under the terms of the sales agreement and the extent to which Defendant's operations would be impacted. Defendant's objections to the proposed draft CAP on the ground the capping of the WMUs focus on the extent to which implementation of the CAP would impair

the economic value of the land to Defendant because mining for aggregate in the tailings would be prevented or hampered. At oral argument Defendant represented that if its aggregate mining operation was prevented or substantially hampered during the rainy season, Defendant would be at risk of default of its contracts, particularly a large contract to provide aggregate for a large state highway construction project. Defendant represented that such a default would put Defendant's operation at risk of failure and would place personally guaranteed loans at risk of default.

Defendant's opposition states its position that Defendant would agree to the implementation of the CAP if Defendant is notified of the details of the CAP and consents to same and/or is compensated for value lost. Plaintiff alleges it again invited Defendant to submit a proposed CAP. It is not clear whether Defendant did or did not submit a proposed alternative CAP that would address Water Board's directive to prevent run-off of contaminated water during the next rainy season. The Application alleges that Defendant would not agree to any approach to achieve compliance with Water Board's directive that Plaintiff proposed.

The Application alleges that, in light of Defendant's refusal to agree to any plan put forward by Plaintiff, and in the face of an approaching deadline imposed by the Water Board, Plaintiff submitted the proposed CAP to Water Board on June 22, 2006. On June 27, 2006, Water Board wrote to Plaintiff and Defendant indicating the board's agreement with the elements of Plaintiff's proposed CAP. The letter also contained a number of requests for additional information and clarification as to the details of Plaintiff's plan. Plaintiff commenced preliminary contracting and was ready to begin on-site work by late July 2006.

The Application alleges that Defendant refused site access to the contractors and threatened to cut off power to Plaintiff's reverse osmosis plant, which was treating drainage waste water in accordance with the CAP. Plaintiff alleges that as a result of Defendant's refusal to grant access to the work site, progress was delayed to the extent Plaintiff was forced to submit an amended proposed CAP, which limited the work to be completed before the 2006 - 2007 rainy season to that necessary to prevent excess contaminated run-off, with the remainder of the work

4

to be completed after the 2006-2007 rainy season.  Ultimately, the delays required Plaintiff to re-submit an amended CAP to Water Board on or about August 18, 2006.

Defendant does not directly contradict Plaintiff's allegation that Defendant refused access to the work site, but alleges that the delays requiring Plaintiff to submit the amended CAP were actually occasioned by the fact that Plaintiff had not received required permission from Forest Service to build a road across Forest Service land in order to access a portion of the work site in order to fully implementation the CAP.  The record supports Defendant's contention in this regard.

Defendant does not dispute that it denied access to contractors or that it refused to allow access to equipment necessary to carry out the planned activities.  Defendant contends Plaintiff had no right to enter the property to the extent called for in the CAP without a separate access agreement and that Defendant is entitled to compensation for its losses that arise as a result of the implementation of the CAP.  At oral argument, Defendant also argued that other, less intrusive, means exist to address Water Board's concerns, including treatment of run-off water by reverse osmosis.

Plaintiff alleges Water Board Staff informally approved the phased plan reflected in the amended CAP on August 25, 2006.  Water Board requested a construction schedule that would indicate how three identified WMUs would be covered on or before November 15, 2006.  Water Board also threatened enforcement action if the deadlines were not met.

Plaintiff alleges that, following the informal approval of the amended CAP by the Water Board, Defendant has continued to take affirmative actions to prevent work.  Plaintiff alleges Defendant continues to refuse to allow, or has limited access to, the work site and has refused to allow full access needed to implement the CAP until Plaintiff agrees to a new access agreement, which includes compensation to Defendant for use of the site.

Plaintiff's Application  was filed and served on September 8, 2006.  Plaintiff alleges work at the site must begin not later than September 18, 2006, in order for the first phase of the CAP to

5

be completed prior to the beginning of the 2006-2007 rainy season.  Plaintiff alleges that if the actions specified in the amended CAP are not commenced immediately, there is risk that winter rains will result in further release of contaminants into surface and groundwater.  Oral argument on Plaintiff's application for TRO was heard on September 21, 2006.  Both parties were present and represented by their respective counsel.

## LEGAL STANDARD

By implication, Local Rule 65-321 defines an *ex parte* application for restraining order as being without notice to the adverse party.  Because the record in this case indicates Defendant was notified of Plaintiff's intent to seek a temporary restraining order at the earliest possible time, the court finds Plaintiff's request is not *ex parte* within the meaning of the Local Rule.  Requests for temporary restraining orders which are not ex parte and are noticed to the opposing party are governed by the same general standards that govern issuance of a preliminary injunction.  See, Motor Vehicle Board of Cal. v. Orrin W. Fox, 434 U.S. 1345, 1347 n. 2, (1977); Los Angeles Unified School District v. United States District Court, 650 F.2d 1004, 1008 (9th Cir. 1981); Century Time Ltd. v. Interchron, 729 F. Supp. 366, 368 (S.D.N.Y. 1990).  Under the so-called "traditional" standard, an injunction may be had if the court determines that (1) the moving party will suffer irreparable injury if the relief is denied; (2) there is a strong likelihood that the moving party will prevail on the merits at trial; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief.  International Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir.1993).  Under the "alternative" standard, an injunction properly issues when a party demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or (2) the existence of serious questions going to the merits combined with a balancing of hardships tipping sharply in favor of the moving party.  Id.  The requirement for showing a likelihood of irreparable harm increases or decreases in inverse correlation to the probability of success on the merits, with these factors representing two points on a sliding scale.  United States v.

Nutri-cology, Inc., 982 F.2d 394, 396 (9th Cir.1985)." Earth Island Institute v. U.S. Forest Service, 351 F.3d 1291, 1310 (9 Cir. 2003). In addition, "to prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." Lebron v. Armstrong, 289 F. Supp. 2d 56, 61 (D. Conn. 2003).

### DISCUSSION

There appears to be little dispute as to the allegation that Water Board has found that runoff from several of the WMUs exceed legal limits under California environmental law; or that Defendant's refusal to allow access to the mine has impeded corrective action as set forth in the CAP. Defendant's legal contentions appear to be twofold. First, Defendant contends Plaintiff is not operating pursuant to a legal obligation because the approval of the CAP is not final. Second, Defendant the terms of the sales agreement permit Plaintiff to carry out only monitoring activity and that access to the site for the purpose of major construction, as is necessary to implement the CAP is not authorized under the terms of the sales agreement.

**I. Likelihood of Success on the Merits**

To succeed on the merits of this action, Plaintiff must show that it has the right under the sales agreement to enter the property and take action in connection with regulatory requirements, and show that the CAP as amended and approved by Water Board is a regulatory requirement.

*A. Purchase and Sale Agreement Empowers Plaintiff to Undertake Reclamation Activities to Meet Regulatory Requirements*

Plaintiff's right to enter the land to carry out monitoring and other actions as required for regulatory compliance is referenced at a number of points in the Sale Agreement, however the principle provision addressing Plaintiff's rights to carry out actions in connection with regulatory requirements is Provision 14. That provision provides as follows:

> Buyer's Operational Obligations. Following the Effective Date of this agreement and subject to the following notification requirement, Buyer shall have the right to develop, mine or operate the Subject Property in its sole discretion and will not have any liability of any nature whatsoever to Seller except for Buyer's

7

acts of negligence, fraud or willful misconduct and for those acts, omissions activities or operations of Buyer that affect Seller's activities in connection with the Regulatory Requirements. Buyer shall notify Seller of all Buyer's activities or operations affecting the Subject Property prior to the commencement of such activities or operations.

(a) Upon reasonable notice to the Buyer, Seller shall have the right, at Seller's reasonable discretion and expense and for the duration of the Regulatory Requirements, to enter and inspect the Subject Property and to perform such actions as necessary for the purpose of complying with and satisfying the Regulatory Requirements; and to determine whether Buyer's operations or activities are in any way impairing the condition of the Subject Property or adversely affecting Seller's ability to meet, satisfy or otherwise comply with the Regulatory Requirements.

(b) It is hereby expressly agreed that in the event Seller determines that Buyer's ownership or operation of the Subject Property is adversely affecting the condition of the Subject Property, including without limitation any environmental, natural resource, health or safety condition that Seller has determined is adversely affecting the condition of the Subject Property or is otherwise impairing the Seller's ability to meet, satisfy or otherwise comply with the Regulatory Requirements, Seller shall promptly notify Buyer and upon notification, Buyer shall immediately cease all operations or activities on the Subject Property.

(c) Upon notification, Buyer shall immediately cure, remedy or abate any environmental natural resource, health or safety condition that Seller determined is adversely affecting the condition of the Subject Property or is otherwise impairing the Seller's ability to meet, satisfy or otherwise comply with the Regulatory Requirements. Upon completion of such abatement to the reasonable satisfaction of the Seller and upon written consent by the Seller, Buyer may commence operation or activities on the Subject Property.

(d) If upon notification Buyer fails to immediately cure or remedy any environmental, natural resource, health or safety condition that could adversely affect the condition of the Subject Property or impair the Seller's ability to meet satisfy or otherwise comply with the Regulatory Requirements, Seller has the right to cure, remedy or take other such other actions, which include but are not limited to: conducting in accordance with any applicable environmental law investigation, sampling, testing, abatement, cleanup, removal, remediation or other response action as necessary to remove, remediate, cleanup or abate any condition caused by the Buyer; the reasonable satisfaction of the Seller. Such actions undertaken by the Seller shall be at the expense of the Buyer to the extent such actions undertaken by the Seller shall be at the expense of the Buyer to the extent such actions are attributable to events or conditions which arose as a result of the Buyer's operations or activities. Upon completion of such abatement and upon written consent by the Seller, Buyer may commence operations or activities on the Subject Property.

(e) Seller's rights under this paragraph shall be in addition to all equitable legal or administrative remedies available to Seller at law or in equity including without limitation injunctive or declaratory relief for any material breach of the terms and provision of this agreement by Buyer.

The foregoing excerpt is not exhaustive of all provisions of the sales agreement pertaining to compliance with regulatory requirements, however, to the extent regulatory compliance is otherwise mentioned, this section is cited as providing authority for Plaintiff to take actions as necessary to achieve regulatory compliance.

At the core of Defendant's arguments with regard to likelihood of success on the merits is Defendant's contention that the term "Regulatory Requirements" is a defined term whose parameters exclude large-scale remedial work, as is being proposed in the CAP. Defendant relies on subparagraph 2(c), which carves out "those obligations in connection with certain monitoring and reclamation activities which are more fully described in Exhibit B (the 'Regulatory Requirements'), . . ." from those interests that are transferred to Defendant by operation of the Sale Agreement. Defendant contends that the defined term, "Regulatory Requirements" is therefore defined by, and limited by, the terms of Exhibit B, which provides as follows:

> The attached plan map delineates the area of influence that will continue to require monitoring by Seller. Any and all activities proposed by Buyer that may influence the statutory monitoring requirements pursuant to the post mine closure requirements imposed by the [Water Board] as set forth from time to time in correspondence or other documentation issued by the [Water Board] (a copy of which is also attached) must be approved by Seller prior to any such action taking place. Actions pertaining to the area of influence shall be dealt with in accordance with paragraph 14 of the Purchase and Sale Agreement to which this exhibit is attached and fully incorporated.

Defendant contends that the foregoing language both defines the term "Regulatory Requirements" and confines it to monitoring activities to be conducted within the areas indicated on the referenced map. (The referenced map apparently includes the area where the WMUs are located.) The court disagrees with Defendant's contention. First, subparagraph 2(c) defines the interests retained by Plaintiff as include both "monitoring *and reclamation* activities." Exhibit B is not referenced as a definition of the activities, but as an illustration of the area within which those activities are to take place. Second, Exhibit B, by its own language, does not limit *Plaintiff's* activities. Instead, it limits the activities *Defendant* may engage in by requiring that "[a]ny and all activities proposed *by Buyer* that may influence the statutory monitoring

9

requirements . . . must be approved by Seller prior to any such action taking place." Thus, by the terms of Exhibit B, Plaintiff (Seller) requires that Defendant must obtain consent from Plaintiff before initiating any activities in the area described by Exhibit B that will affect Plaintiff's monitoring activities. Plaintiff's activities, on the other hand, with respect to the area indicated on the map (the "area of influence"), are governed by the provisions of paragraph 14.

Paragraph 14, as quoted above, clearly indicates that Plaintiff shall have the right "to perform such actions as necessary for the purpose of complying with and satisfying the Regulatory Requirements." Since Paragraph 2(c) defines the scope of Regulatory Requirements as encompassing both monitoring *and reclamation* activities, it follows that the terms of the Sale Agreement grant Plaintiff the right to carry out at its own expense whatever reclamation activities is deems necessary to meet the regulatory requirements as identified by Water Board.

***B. Water Board's Directive to Develop and Implement the CAP is a Regulatory Requirement***

The exhibits submitted by Plaintiff show that Water Board identified the problem of contaminated run off from the WMUs and directed both Defendant and Plaintiff to develop a CAP or face further official action. The exhibits also demonstrate that Plaintiff engaged in extensive communication with both Water Board and with Defendant to develop the CAP and continued to communicate with Defendant when amendment of the CAP became necessary. The court also presumes for the sake of this order, that Water Board is an official California agency empowered to both require Corrective Action Plans to address problems or threats of pollution, and to approve proposed Corrective Action Plans.

Defendant's opposition makes two contentions regarding the CAP. First, Defendant contends the CAP is not a regulatory requirement in that it does not represent a final rule of the regulating agency. Second, Defendant contends that the amended CAP under which Plaintiff is trying to operate has not been formally approved by the Water Board and is therefore not a Regulatory Requirement withing the meaning of the Sale Agreement. The court disagrees.

10

While the term "final rule" has considerable technical importance in the areas of environmental and administrative law, the term has no direct relevance to the area of contract law that governs the court's determination of the terms of the Sale Agreement. The Sale Agreement makes it clear that the source of Regulatory Requirements as contemplated in the Sale Agreement is the Water Board, which may impose requirements "from time to time in correspondence or other documentation." Exhibit B. Thus the Sale Agreement contemplates Regulatory Requirements as arising from ongoing correspondence and routine oversight by the Water Board, not from formal rule making or similar formal activity. The court concludes Water Board's directive to both Plaintiff and Defendant that a CAP be developed to prevent additional run off of contaminated water establishes a Regulatory Requirement within the meaning of that term as defined and used by the Sale Agreement.

The court also reject Defendant's contention that Plaintiff is not entitled to implement the terms of the proposed amended CAP under the Sale Agreement because Water Board has not given final approval to the CAP. Water Board's correspondence made clear the range of options available to Plaintiff and also made clear the intended outcome. <u>See</u> Doc. 10, Exhibit A. Continuing correspondence between Plaintiff and Water Board also makes it clear that Plaintiff's overall plan to cap the WMUs and treat accumulated water by reverse osmosis is acceptable to Water Board as a general approach. The correspondence indicates the only unsettled issues have to do with specifying details as to how the various steps would be accomplished. Because the Sale Agreement defines Regulatory Requirement as obligations placed on Plaintiff as a result of occasional communication between Water Board and Plaintiff, Plaintiff is not prevented by the Sale Agreement from taking action to meet Regulatory Requirements when communication with Water Board delineates the Regulatory Requirement with sufficient specificity to allow meaningful action. The court finds the provisions of Paragraph 15 of the Sale Agreement are sufficiently comprehensive to authorize Plaintiff actions to meet Regulatory Requirements when such Requirements are set forth concretely and it is to Plaintiff's advantage to not dely.

11

The court has reviewed the Plaintiff's exhibits, including copies of communications with the Water Board and finds that those exhibits sufficiently support Plaintiff's allegations with regard to the necessity and specificity of the action required and implied approval of the actions called for by the amended CAP.  The court therefore finds Plaintiff's development of the proposed amended CAP, the submission of the proposed amended CAP to the Water Board for approval, and subsequent actions taken by Plaintiff pursuant to the terms of the approved amended CAP are actions necessary to meet "Regulatory Requirements" within the meaning of the provisions of the Sale Agreement.

The provisions of the Sale Agreement quoted above make it clear that Plaintiff can successfully show they are entitled under the terms of the sales agreement to enter, and to cause others to enter the property to implement the provisions of the CAP for purposes of meeting "Regulatory Requirements."   Therefore Plaintiff's underlying complaint that seeks to prevent Defendant from taking any action that would interfere in Plaintiff's actions to achieve compliance with "Regulatory Requirements" is very likely to be successful on the merits.  The court finds Plaintiff has met its burden to show likelihood of success on the merits.

**II.  Likelihood of Irreparable Injury**

The injury at issue here is the release of water run off from the WMUs containing levels of toxic chemical contamination in excess of lawful amounts into ground or surface waters.  The court presumes for purposes of this order that release of run off water contaminated by toxic chemicals from the WMUs as prohibited by the Water Board constitutes environmental injury. As Plaintiff notes, it is well established that environmental injury, by its nature is usually considered "irreparable."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). Because Water Board had previously monitored the effluent from the WMUs during prior rainy seasons and had found that run off containing impermissible levels of contamination had, in fact, occurred, the court must conclude that in the absence of action to implement the CAP the likelihood of release of unlawful levels of polluted drainage water, and therefore of irreparable

12

harm, is a near certainty.

Defendant's opposition to the Application considers this case is not fundamentally an environmental case and that the issue of irreparable harm is to be assessed from the point of view of Plaintiff, not the environment. Defendant contends, based on this view, that Plaintiff suffers no irreparable harm because plaintiff faces no immediate liability as a result of inaction, since there has not been a final Water Board ruling on the amended CAP. Defendant contends Plaintiff faces no imminent possibility of fines and, event if violation were to be found by Water Board and fines levied, the damage would only be monetary and not irreparable.

The court simply disagrees with Defendant's focus with respect to irreparable harm. The harm at issue in this case is environmental harm that the CAP seeks to prevent. The issue is not whether Plaintiff would suffer irreparable harm as a result of its regulatory non-compliance, the issue is whether Plaintiff is entitled under the terms of the Sale Agreement to take action prospectively to prevent irreparable environmental harm. Although Defendant speculates that the actions set forth in the proposed amended CAP may not, in fact, prevent the environmental harm, Defendant's speculation is outweighed by the fact that the capping of the WMUs as proposed by the CAP is consistent with both Water Board assessment and statutory direction. The court finds there is a substantial risk of irreparable environmental harm if the injunctive relief is not granted.

**III. Balance of Harms**

At oral argument, Defendant elaborated on the harms Defendant would suffer if the CAP, as currently envisioned, were to be implemented. Basically, Defendant alleges economic harm if the WMUs are graded and capped according to the provisions of the CAP because its access to the crushed rock located in the WMUs would be interfered with or prevented altogether. Defendant emphasizes that the financial health of several families are tied to the ability of Defendant to continue its aggregate mining operation without substantial impediment.

The court makes two observations with respect to the potential for harm to Defendant. First, the fact Defendant is exposed to the risk that actions required by Water Board to meet

Regulatory Requirements might interfere with or impair the value of the property to Defendant is a bargained-for feature of the Sale Agreement and is, in part, a reason for the relatively low sales price. Second, the bulk of Defendant's risk of economic harm is tied to the details of the implementation of the CAP, not to whether the CAP is immediately implemented or delayed. As previously discussed, the court has concluded that the terms of the Sale Agreement place authority with Plaintiff to carry out any remedial actions that may be required to satisfy Regulatory Requirement as determined by Water Board. Water Board is empowered to dictate the remedial actions necessary and Plaintiff is duty-bound to implement Water Board's directives. Defendant is without a legal basis to prevent Plaintiff from implementing Water Board's directive. Thus, whatever risk of harm Defendant faces from the issuance of a TRO in the immediate term is diminished by the risk that substantially similar economic harm will accrue to Defendant in the near future when substantially the same remedial actions will likely be required. From these two observations, the court concludes that, while Defendant's risk of harm is not insignificant by any means, the bulk of that risk does not arise from the issuance of the requested TRO, but arises from the nature of Defendant's enterprise and from the nature of the environmental risks that are a feature of the property and were clearly appreciated by all parties at the time of the purchase.

The court concludes that potential harms to Defendant, although not insignificant, do not outweigh the potential harms to the environment that would accrue from further delay of implementation of the CAP.

**IV.  Public Policy**

The court takes it as given that public policy considerations favor compliance with environmental laws that seek to limit or prevent contamination of ground or surface water with toxic chemicals and disfavor private efforts to block compliance with such law.

**CONCLUSION AND ORDER**

By either the traditional or alternative test, Plaintiff has met the burden of showing that it is entitled to the issuance of orders to temporarily restrain Defendant from actions that would

impede compliance with applicable environmental law.  Plaintiff has shown a high probability of success on the merits and has shown a significant likelihood of irreparable harm if such injunctive relief should not issue.  At oral argument, the court afforded the parties an opportunity to meet and confer to see if an agreement could be reached as to the specific provisions of a TRO.  The parties have met and have submitted their proposed temporary restraining order.  The court sets forth below the temporary restraining order as approved by the parties.

THEREFORE, in consideration of the foregoing discussion, it is HEREBY ORDERED that:

1. Defendant SUTTON ENTERPRISES, and its agents, partners, employees, contractors, assignees, successors, representatives, and all persons acting under authority from, in concert with, or for them in any capacity, including in a volunteer capacity, are hereby restrained and enjoined from taking any action that interferes with or delays Plaintiff's implementation of the following measures to be conducted this year (on or before December 31, 2006) at the Mine:

   A. Work and activities by or on behalf of Plaintiff Carson Hill Gold Mining Corporation to place water collected from with the boundary of the Mine site into waste management unit 3 (WMU-3) for storage.

   B. Work and activities by or on behalf of Plaintiff at waste management unit 1 (WMU-1) to establish side drains along haul roads to convey water to the portion of the open pit which will minimize interruptions to the Defendant's operations.

   C. Work and activities by or on behalf of Plaintiff at waste management unit 2 (WMU-2) to divert water offsite and to waste management unit 3 (WMU-3).

   D. Work and activities by or on behalf of Plaintiff to prepare WMU-3 to contain water.

   E. Work and activities by or on behalf of Plaintiff at waste rock dump 5 (WRD-5) to

      divert water around the dump by installing a culvert and open ditch alongside the haul road and north of the WRD.

F.    Work and activities by or on behalf of Plaintiff to complete construction of an electrical substation in its current location at the west end of WMU-3, and to coordinate with PG&E and the Bureau of Land Management to bring power to the eastern portion of the Mine site. The supply of power will be sufficient (i) to manage wastewater within WMUs to the extent feasible; including transferring water from WMUs 1 & 2 to WMU-3, (ii) complete implementation of the proposed amended CAP and (iii) to relocate Plaintiff's office away from ongoing aggregate operations of Defendant.

G.    Work and activities by or on behalf of Plaintiff to relocate Plaintiff's office near WMU-3.

H.    Use of all access roads to the Mine to achieve all of the above. Access through the back gate will be conducted in a manner that minimizes any disruption to the non-impacted areas of the Property.

      Such work and activities shall be conducted in accordance with the terms of the Purchase and Sale Agreement between the parties and shall be conducted by qualified, licensed and bonded contractors, in compliance with applicable laws and safety regulations. Plaintiff bears the cost and risk of such work and activities described above to be conducted on or before December 31, 2006. Unless infeasible, Plaintiff will provide Defendant with copies of all permits, plans, specifications, unprivileged investigations, and test results relating to the work. In the event of any work outside of the Mine's normal work hours (7:00 a.m.-5:00 p.m. Monday through Friday), Plaintiff shall be responsible for locking the gates at the Mine.

2.    Defendant SUTTON ENTERPRISES, and its agents, partners, employees, contractors, assignees, successors, representatives, and all persons acting under authority from, in

concert with, or for them in any capacity, including in a volunteer capacity, are hereby restrained and enjoined from taking any action that interferes with or delays Plaintiff's implementation of instructions, directions, and actions contained in orders, correspondence, and other communications to both Plaintiff and Defendant from the Central Valley Regional Water Quality Control Board of the State of California to implement the above work at the Mine.

3. At the Court's request, the parties have met and conferred on the scope of work and on minimizing adverse impacts on Defendant Sutton Enterprises' business operations, as set forth in sections 1.a. through 1.g. above. The parties' agreement on these provisions is without prejudice to either party's rights, claims, or defenses in this litigation, or with respect to the Purchase and Sale Agreement. This Temporary Restraining Order does not limit any party's rights under the procedures of the Central Valley Regional Water Quality Control Board.

4. Plaintiff CARSON HILL GOLD MINING CORPORATION shall post a bond in the amount of $300,000.

5. This Court retains jurisdiction to hear and decide further issues that may arise in the course of performing this above work.

6. The parties shall cooperate to allow the above work to proceed and to avoid unreasonable interference with the other's operations as a result thereof.

7. This order shall remain in effect until December 31, 2006. It may be extended by stipulation of both parties, or by order of this Court after notice and opportunity to be heard.

IT IS SO ORDERED.

Dated:   September 28, 2006              /s/ Anthony W. Ishii
h2ehf                                    UNITED STATES DISTRICT JUDGE

17